Thank you, and good morning, and may it please the Court. My name is John McCormick, and I represent the appellant, Officer Hackett, in the city of Calexico. We are here in a bit of an unusual procedural posture. At issue in the trial court was the qualified immunity as a defense to a 1983 action. Basically, that's the roots of this case. However, rather than the usual circumstance where the defendant brings a summary judgment motion on that issue, and it's denied, which gives the police or the city the right to appeal, we're here on the plaintiff's motion for summary judgment, in which we pled and attempted to prove, through our opposition papers, through that motion, the presence of tribal issues of fact on both the determination of probable cause and on the application of the qualified immunity. So it's a little bit of a twist on what you may be used to seeing in terms of an appeal from a qualified immunity denial. In the trial court, Judge Miller denied our affirmative defense of qualified immunity, made a finding that there was no probable cause for the arrest of Mr. Villegas, made a finding that there was no probable cause for Officer Hackett to enter the Villegas Martinez home. It is those facts that we are now looking at. My suggesting is that we look at this as in a sauté approach, and with two separate fact scenarios. One is, did Villegas resist? And the second is, did Officer Hackett have a right to enter the home? Those two fact nexuses, which the sauté analysis must approach. And let me talk about the first. To the extent they're interrelated. They are. They are. And I've toyed with that. And I think, for my purposes of clarity, the best approach I can do it, as I outlined, is to look at one and then the other. And sure, they do interrelate. The whether he could enter the house has to do with whether Villegas could or could not have resisted, if he did resist. What I intend to do is to isolate. I don't understand that statement. I'm sorry? Whether he could enter. Enter the house. Yes. If Officer Hackett could enter the house, then Villegas could not resist. I think that's a non-sacred. An officer might have the right to enter a house, but a homeowner can still say, no, thank you, you can't come in. The homeowner may refuse consent. Precisely. Yes. And can stand in the doorway and scream at the officer and say, you're not coming into my house. He can't attack the officer, of course. I'm sorry, you can't? Attack. He cannot attack the officer, of course. Right. You're right, Your Honor, of course. But it doesn't have to be a physical force used by the occupant or homeowner. Let's call him, in this case, Mr. Villegas. It doesn't have to be physical force? No, ma'am. It does not. Let me just say, I have in the district court's order that during oral argument, the defense counsel candidly conceded that Villegas did not forcibly resist. So that was you? That was me. I was there. So there was no force? I don't recall admitting that, and I made a comment to that in a footnote in our brief. But I think that the facts support the conclusion that he did not — well, no. He did not aggressively attack the officer. He did physically resist the officer's entry into the house. He stood in the doorway and said, no, you can't come in. He did more. I do not consent to your entry. Your Honor, I — with due respect, he did more. If you look at the testimony of Officer Hackett and the trial judge admitted he stood in the doorway. Let me get my spokesman. I still have a problem with your backing off. The district court says that you candidly conceded, and I don't — there's nothing that — that's a factual determination, I guess, and I don't see anything that contradicts that. Well, I cited to the record of oral argument before the district court in a footnote of our brief, and I don't believe that that's a fair interpretation of what I said. But regardless, let me, if I might, outline those things that Mr. Villegas did in addition to merely refusing consent. He stood in front of the door. He blocked the doorway as if to protect it. He positioned his body so as to clearly indicate he would not allow the officer to enter. Villegas's voice was escalating. Villegas's body language was agitated. Officer Hackett — and this is a key distinction from Wetzel. Officer Hackett told Villegas he was going to enter the house. He had his Fourth Amendment waiver. He was going to enter the house. He should step aside or he was going to have to arrest him for resisting, delaying or obstructing the officer's performance of his duty. And let me underline those words in the statute. Resisting, delaying or obstructing. And we cited and discussed at some length a case called Mohammed C. That statute doesn't obliterate the Fourth Amendment. No, ma'am. It does not. And I don't suggest it does. But the Fourth Amendment only prohibits unreasonable — But just reciting the statute to someone who's saying, I don't consent, doesn't suddenly turn it into, you know, obstruction, delay or whatever. I mean, just saying there's a statute doesn't alter the Fourth Amendment rights of the person not to allow the officer into the house. There is — it's clear that a simple refusal to consent does not warrant an arrest for probable cause. And that — and that line of cases is clear. That's Wetzel and Prescott. And I don't have an argument with them. The problem that we get to is applying the facts of a given case to that clear, bright line of law. We've got — if you look at the dissent in Wetzel by Justice Clark of the California Supreme Court, he takes an issue — you look like you know him, Justice Breyer — but he takes an issue with the Court's interpretation of those facts in that case. We have Officer Hackett. Well, he does, but that underscores the point. A citizen can stand in the doorway and, yes, if I stand in the doorway, I suppose I'm blocking it, unless I'm awfully skinny, but we don't have evidence of whether he's skinny or not. He can stand in the doorway and say, no, I don't consent to your coming into my house. That's all. You can't come in. Now — Well, I — I feel like everybody's on two different tracks here. If I understand it correctly, your — the heart of your position is that he wasn't being asked to consent because the Hackett believed he, Hackett, had the right to enter the house under the waiver. Have I put your position correctly? Yes, ma'am, except he did — they did initially ask for consent. When it was apparent it wasn't coming, Officer Hackett was crystal clear, we have the right to come in, I'm coming in, it wasn't — If you don't have — you agree if there's no — if there is — are no exigent circumstances and you don't have a search warrant or the functional equivalent of a search warrant, you can't go in without consent, period. Do you agree with that? No. And let me — that's the second part of my saut�e. Oh, I don't see how you could disagree. Let me get — that's the second part of my saut�e analysis. It's impossible to disagree with. We have a warrant for his arrest. We have a lot of information that he lives there. And we're — But that's not — that's not my question. Okay. I'm sorry. I'm trying to just hone in on where the area of disagreement is here. My proposition was, absent exigent circumstances or a search warrant or its functional equivalent in the form of the Fourth Amendment waiver, you cannot go into a house without consent. Sure. Do you agree with that? Yes. Yes. All right. So your position is that here you had the functional equivalent of a search warrant. Therefore, you did not need to have, but would have liked to have gotten, consent. Is that your position? Yes. They clearly sought consent. Now, my question is, how do you reconcile all of this with the fact that you have your authority to search, construing it most liberally in your favor from the waiver, was to search Martinez's place of abode? Yes. And it wasn't? The trial court found that the officers in the probation department did not have sufficient cause to reasonably believe it was under law. I know. And how do you get away from that? Because it wasn't. I mean, the best information you had was that he told, two years prior, he told the officers that that's where he lived, that he lived there for two years, he lived there with his mother, and that's what they had. They had no other information that he was, that was his place of abode. So if not, the authority to enter disappears. And you need to have consent. And he couldn't. I mean, he refused that. The issue under Motley, the en banc decision in Motley, was that the officer has to have reasonable cause to believe that's his residence. Correct. And that would justify, that would justify the entry. Okay. Where's the reasonable cause? Let me tell you what Judge Miller, in his ruling, helped us out with that. In his, in oral argument, Judge Miller recited all of the facts bearing upon the question of the reasonableness of the belief that that was his residence. And that's cited, and I have the cite here if you want it. And then Judge Miller concluded, in oral argument, not in his written opinion, but in oral argument. Well, he changed his mind. I mean, obviously. But, yes, obviously, he changed his mind. And maybe it was on, because he had the first Motley case in front of him, where they were told that they should have called the jail to find out if he was in there, which disappeared in the second. But Judge Miller concluded, I would be inclined to find there is a genuine issue of material fact relative to that threshold issue. And he found that. Why don't you tell us the facts? Okay. Tell us, tell us a couple of good facts. Okay. I've got this. Just to illustrate that they had reasonable cause. Just, well, you only have three minutes left. I've already told him to you. Is there anything else other than what I've said? Well, let's start. They told him two years before that that's where he lived. I don't know. He lived there for two years before that. I thought it was five. That his mother lived there. When they knocked on the door, it was confirmed that that was his family's place. I thought it was five months. But the key to me, and maybe I'm as simpleton as, that it's not a random address. It's not Joe Blow's address. Who cares if it's random or not? The point is, wait a minute. The probation officer, the only thing he knew was what Judge Reimer just said. That's all he knew. The probation officer knew the guy had been deported, actually. Never mind. If we're going to take into account what the officialdom really knew, they knew he'd been deported, actually. They also knew that he was a longtime felon with lots of aliases. Nobody had ever checked, they said. They never checked to see if he ever did live there, ever. They just took his word for it. Okay? Now, where is your reason? What other fact do you have that shows reasonable cause? Just give us a fact. No argument, a fact. His statements was not on one occasion. His statements were over a period of years. That was in the probation. Same felon, same information, over a period of years ending two years before. Give us another fact. Another fact is he was obligated by the court, by the terms of his probation, to advise of any change of address. Now, give us a fact that has something to do with the folks that live in the house, that shows he lived in the house. It was his mother and his brother. And I'm, I may be simpleton, but I'm very persuaded by that because it's not a random house, it's not Joe Blow's house. They go there, it's not unreasonable to believe that that is his house. And in terms of the deportation. Why is it unreasonable to believe it's his house? He's a big adult guy. He's been in prison all over the place. He's been deported, actually. And nobody even checks with a neighbor. Does this guy ever seen around here? Nope, nobody. The probation officer says, we don't even bother going to check to see if a person lives where he says he does. And you descend on him with eight to ten officers. The question that pops in my head is why not leave six or eight officers and send two down to get a search warrant? They have a lot of these to execute upon, Your Honor. Eight to ten guys. They have a large workload. And it may not seem significant now, but it is to do with the time. Is this job overworked that they can't comply with the Fourth Amendment? No, I don't mean to belittle the Fourth Amendment, certainly.  In light of the long-standing repeated address given by this man, the fact that it was his mother and his brother. And also the conduct of his brother, too, not just in the refusal to consent, but the other evasive conduct. His evasion was, he said, the guy doesn't live here and we're not going to let you in the house. That's pretty evasive, all right. Well, Your Honor, let me compare the... No, isn't that what the brother did? The brother said, he doesn't live here. He hasn't lived here for years. We don't even know where he is. He's not in this house and we're not going to let you in the house. And as the Motley Court remarked, it's... That's not very evasive, I don't think. As the Motley Court remarked, Your Honor, it's not infrequent that relatives and friends give misleading information to police officers when they're looking for suspects. So go get a search warrant. You don't just barge into someone's house and then arrest them. I believe Motley, too, says that that's not required under these circumstances, Your Honor. But thank you very much. Thank you. Thank you, Mr. McCormick. Mr. Maranin.  Maranin. Hey, police court, good morning. Mike Maranin for Mr. Villegas. I think the Court has highlighted the fact that we are talking about the sanctity of the home here, and I know you know that, but I just can't help but not start my argument off with that. In terms of the facts that they had, what did they have? They had essentially two facts. They had the fact that two years before, Mr. Martinez had given that address as his address, and they had the fact that the people living in the home were Mr. Martinez's brother and mother. And that's all they had. And that, contrary to his court obligation, he hadn't given an update. He hadn't done anything. We know, again, this goes to whether we're going to do anything. And when they got there, the house was, in fact, occupied by the brother and the mother. Right. And he had said he had lived there for the prior two years, which is a fairly long, continuous period of time. Well, he gave that as his address. Yeah. Well, I mean, I'm just pointing out all the facts. Right. There are more than two. I don't know that they make any difference, but there are more than two. Fair enough. I appreciate that, Your Honor. I think that, to me, what's important is the information they didn't have. They had absolutely not. And so the question is, what did you actually do based on what you actually knew? And was that sufficient to create a reasonable belief that that was his house and he was there? Fair enough. I think that what I was going to say is that they had absolutely no information that this man had ever actually lived there. Other than his word. Right. Exactly. Because they can't take his word. I think that is a little bit of a... I mean, I'm being serious about it. I don't think it's funny at all. I think when somebody tells a government official something in order to get probation, which is a government benefit that he wasn't entitled to, and he makes a representation and he says, here is my address and I know I have to tell you if I don't live there, I think that's entitled to some degree of weight. How much is a different issue? I think that's fair, Your Honor, that it's... All right. If that's fair, then the question is how much weight is it entitled to in the circumstances of its being, you know, two years old, which is stale. Right. And don't forget, here is the warrant itself had a different address on it. Well, yeah, but that, you know... Well, I was going to ask about that. What was in the record about the origins of that address on the warrant? What's in the record is that 235 Encinas is on the warrant and is in two other places in the probation file. Okay. One had to do with an investigation by the Calexico Police Department, and that was his address, and then there's other references in the probation file to 108 9th Street. What Officer Hackett testified to, and this is essentially all that's in the record, is that he didn't go to that address. He didn't go check it out. He didn't ask if there was a PO, if he was getting mail there. He said from his memory that was a mailboxes, et cetera, type place where people have PO boxes. So in my ---- that's what his testimony is. In my view, if anything, that cuts against Mr. Villegas living at 108 9th Street, because why would... He surely didn't live in a post office box. No, but one ---- I think one inference from that is that why would you need the PO box if you're living at 108 9th Street is the inference that I would draw. Keep drugs in it, for one thing. Pardon me? Keep drugs in it. That's another inference, I think. I think the other thing that we have to consider is the totality of what Officer Hackett did know. He also knew that the guy had 28 aliases and used eight different Social Security numbers, and when the probation officer told him, gave him the little information  file, no information that this man had ever been contacted in any way, shape or form at this address, not even a phone call. Let me ask you a question. If the warrant ---- if the information, the best information that the officers had was two years old, is there any reason to get excited about all this other stuff? I mean, doesn't that just end it? I think so. Okay. So you don't have to worry about anything except just the fact the information that he used to execute the warrant was stale. I think that's enough. Okay. And I think it is ---- it's hard, for me, it's hard to ignore the fact that the address on the warrant itself, which was the most recent document, was a different address. That's all. I mean, I think that's a relevant fact as well. But the truth of the matter is they had nothing. And I guess I should ---- well, I do want to comment on this, and that is, I don't think there's any real question that the law that we're applying and that Judge Miller applied is clearly established. It goes back to the Harper case from 1991. It goes to the Watts case, which was a year and a half before this. No. At a fairly high level of generality, that can't be in dispute. My question is a little more focused, because actually this situation is almost the flip side of those cases and of the ordinary case, where the officers know that the suspect, the parolee, the probationer, is not at his last known address, and they get a tip of some sort that he is, in fact, at somebody else's residence. And in that different circumstance, the question is, do the officers have enough based on the tip, knowing that it's somebody else's residence, to go forward? And in those cases, we have required, expected, upheld only when there is a lot of other cooperation, surveillance, key use, whatever. Here, you do have officers who are relying on his own statement that that's where he lives, and it pans out that that is, in fact, he said he rented from his mother, and that is her house, it's where she is, and whatever. It all kind of computes, although albeit stale. What case is there that made it clearly established in 2002 that the officers couldn't reasonably believe they could rely on what he said, where he said he lived? I mean, what evidence is there? Excuse me, what case is there? To answer that question, Your Honor, I think the clearest cases are probably the Watts case, which is from a year and a half before this search, 2001, and Harper, which goes back to 91. Now, the we're not going to find identical facts, I grant you that. I understand. Okay. But we do have the standard that we're talking about, probable cause or, the way the Watts court put it, substantial evidence. Substantial evidence. Which is what Judge Miller looked at, and he said, okay, what I'm looking for is what the law requires me to look for. Is there substantial evidence? And we have this minimal amount of evidence. And so clearly it falls far short of substantial evidence. And I think we learn a lot from both of those cases, Watts and Harper, when we look at the facts of those cases. In Harper, we have far more information than we have in our case. Sure. But, see, that comes right back to what we were talking about a minute ago. Of course they had far more information, but that's not really the question. The question is whether this information sufficed. And what I'm just focusing in on, and you may tell me that I shouldn't worry about it, but I'm focusing in on the fact that at least so far as I know, which is not much, at least so far as what I know, there isn't anything out there that actually pertains to an execution of a search warrant, excuse me, execution of an arrest warrant at a house where the parolee or probationer said he lives, hasn't changed that address, despite an obligation to do so, and they weren't operating off of an anonymous or otherwise unreliable tip. They're going on what the guy himself said. So what's the closest thing to say that, even if it were wrong, and let's suppose I think it was, even if it were wrong, that it was unreasonable for Hackett to have believed, nevertheless, that he could go into the house under those circumstances? Well, one case that comes to mind, and that is in Motley itself, it had one of the facts of about six or seven was the last known address was the address in question. So we can at least learn from that case that if you have that, you need more than just the last known address. Well, no, that disappeared in the in-bank opinion, as I recall. It was alluded to in the panel opinion that got flipped over. I thought I took that from the inbox. I'll check. You may be right. And I could be wrong, too, but at least I have that in my brain and in my notes, for whatever that's worth. That's worth a lot. The other thing I quoted in my brief, the Mendocino case, where it talks about even though in certain circumstances officers can rely on collective information, the line officer still has an obligation to check into that. And what we know from our case is that Officer Hackett did absolutely nothing to check into the information he was getting. Well, he didn't check in to see whether the person who said it was his house was right. Well, and he didn't even ask any questions. And I think on these facts that's critical. He asks the probation officer who's in his presence making a call. And he says, last known address. And he doesn't ask any questions like, okay, ask him, have you guys ever contacted this man here? Has anybody from probation or law enforcement ever seen him here? Those kinds of questions. And it seems to me when they have no other indicia other than what we've talked about, he's at least obligated to make those inquiries where he had the information readily available. And if we're going to go to the collective knowledge, there's an argument that we ought not. We only should go to what Hackett knew. But Officer Hackett wants to include what he knew from the probation file. And if he'd asked the questions, we know what the answers are. Mail was returned. Nobody ever contacted him, et cetera. So it seems to me that in terms of precedent, we know what the standard is and we need more than what we have here. Okay. One other question. And that is, the factual record is what we've just discussed. And that's fairly clear. There isn't anything to show, like, you know, likelihood that the parolee would still be there or any of those things. It's just nonexistent. I assume you think there is no probable issue of fact on the second part of the qualified immunity inquiry. Correct. And the reason would be why. Well, the facts that you're looking at, the record that you're looking at, is the record in the light most favorable to Officer Hackett. In many respects, these are not my facts. Well, no, because I'll add some more if that's where you're going. I mean, then you have to add the fact that from Hackett's perspective, Villegos was appearing to be protecting the house, somebody in the house. And so, you know, you could add some more on from Hackett's perspective, if you're really looking at it that way. Well, except that he does rely on that, except that he's not allowed to rely on that. We know from Prescott and Graves and the other cases that you, the person's assertion of his Fourth Amendment rights. Sure, but there again, we're taught it's circular, because he has the Fourth Amendment right only if his consent is required. If his consent is not required, then it, he doesn't. Well, actually, I think he does, meaning in the absence, and this is what Prescott squarely holds, in the absence of a search warrant, the homeowner has an absolute right to deny permission. No question about it, but both Prescott and Wetzel involve situations where consent was required. Well, I mean, you know, they had to get consent. Here, the question, in effect, is did they have to get consent, or was the Fourth Amendment waiver sufficient? And that turns on entirely on whether he actually lived there. Well, one thing I do, yeah, one thing I do want to emphasize. In the Wetzel case, the Court was absolutely, the California Supreme Court, they had a right to enter. They were not relying on consent in Wetzel. And the Court said, even where you have a right to enter, and they said, there's a paragraph in Wetzel that says, we want to make it clear, the officers had a right to enter, because it was a hot pursuit of a burglar. And so they had a right to enter, but at the same time, the homeowner had an absolute right to stand in her doorway, refuse admission, because there was no warrant, and the facts in Wetzel are identical to what we have here. The officers in Wetzel said, move, clear out of the doorway. And she stood in the doorway, just like Mr. Villegas did. And the Court said, that's not a crime and it can't be a crime. And you see the fact, those facts from Wetzel are contained in the majority opinion. And then in the dissenting opinion, in a footnote, Justice Clark lays out the actual testimony, where the officer says, I asked her repeatedly to move from the doorway. And the Supreme Court says, it doesn't matter. So it doesn't mean they can't go in. They can walk right in. And if they really believed, if Officer Hackett and the others believed they had a right to enter this house, the big question is, why didn't they just walk in? And why didn't they walk in the front door or the back door, for that matter? I mean, and I think that the fact that they kept asking for consent, which they admit that they did, for 20 minutes. Ginsburg. Because they knew they didn't have the right to go in. That's what I think. I see my time is up, unless there's anything else. Thank you. Thank you, counsel, both of you, for your argument. Thank you, Your Honor. The matter just argued will be submitted. The Court will stand in recess.
judges: Fernandez, Rymer, Wardlaw.